## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMBROSIO ROUSE, PH.D.,     ) | |
| ) | |
|      **Plaintiff,**     ) | |
| ) | |
|     **v.**     ) | **2:06-cv-566** |
| ) | |
| **II-VI INCORPORATED, BRUCE**  ) | |
| **GLICK, individually, CSABA SZELES,**  ) | |
| **individually, KERRY COURTNEY,**  ) | |
| **individually, CARL JOHNSON,**  ) | |
| **individually, MARLENE ACRE,**  ) | |
| **individually, FRANCIS KRAMER,**  ) | |
| **individually,**  ) | |
| ) | |
|     **Defendants.**     ) | |

### MEMORANDUM OPINION AND ORDER OF COURT

Before the Court for disposition are the Defendants' MOTION FOR SUMMARY
JUDGMENT (*Document No. 57*), the Defendants' Brief in Support of Motion for Summary
Judgment (*Document No. 58*), the Defendants' Statement of Undisputed Material Facts in
Support of Motion for Summary Judgment (*Document No. 59*), the Appendix to the Defendants'
Statement of Facts in Support of Motion for Summary Judgment (*Document No. 60*), the
Plaintiff's Brief in Opposition to the Defendants' Motion for Summary Judgment (*Document No.
63*), the Plaintiff's Opposition to the Defendants' Statement of Undisputed Material Facts
(*Document No. 64*), the Exhibits in Support of the Plaintiff's Opposition to the Defendants'
Statement of Undisputed Material Facts (*Document No. 65*), and the Defendants' Rely to the
Plaintiff's Brief in Opposition to the Defendants' Motion for Summary Judgment (*Document No.
66*). The Defendants' motion for summary judgment has been extensively briefed and is ripe for
resolution. For the reasons that follow, the motion will be granted.

### Background

Plaintiff Ambrosio Rouse, Ph.D. ("Rouse"), is a black male who was born on October 6,
1960. Rouse Deposition, p. 4. He is a citizen of Panama. *Id.* On January 31, 2000, Rouse

commenced his employment with eV Products, which is a division of Defendant II-VI Incorporated ("II-VI"). Defendants' Statement of Undisputed Material Facts, ¶ 2. He was hired as a surface processing engineer. *Id.*, ¶ 3. As such, Rouse's primary responsibilities concerned scientific research and the development of II-VI's products. *Id.* He later became an R&D surface processing scientist. *Id.* As a II-VI employee, he was entitled to 1,500 shares of II-VI stock, a performance-based bonus, profit sharing for retirement, health insurance, life insurance, relocation benefits and vacation benefits.[1] *Id.* at ¶ 4.

At the commencement of his employment, Rouse was required to sign several documents. One such document was a confidentiality/non-compete agreement. Def. Exh. B, p. 2, ¶ 6. He signed the agreement on January 31, 2000. Def. Exh. C, p. 1. The agreement included the following language:

> The employment relationship of the parties hereto may be terminated by either party upon thirty (30) days written notice to the other party at any time, with or without cause. The Employer shall continue the payment of wages and benefits through such period although the parties hereto agree that the Employer may request the Employee to stop performing any duties on behalf of the Employer. In any event, the Employee shall remain an employee of the Employer through the end of such thirty (30) day period.

Def. Exh. C, p. 4, ¶ 10. When Rouse signed the agreement, he also signed documents dealing with II-VI's policies regarding conflicts of interest, causes for dismissal, safety orientation, and abuse of drugs and alcohol. Def. Exhs. D, E, F & G.

II-VI has a manual that enumerates several of its policies. The one in effect when Rouse commenced his employment with II-VI was dated July 1, 1997. Def. Exh. I. Rouse received a copy of the policy manual. Rouse signed a stock option agreement on February 4, 2000. Def. Exh. II. On March 31, 2000, he signed a letter of assurance. Def. Exh. J. The letter of assurance stated that, absent prior authorization from the United States Bureau of Export Administration, he would not export or release any technical data or products of II-VI to the governments or nationals of Albania, Armenia, Azerbaijan, Belarus, Bulgaria, Cambodia, China, Cuba, Estonia,

---

[1] Rouse maintains that his termination prevented him from obtaining all of the shares of stock to which he was otherwise entitled. Plaintiff's Opposition to Statement of Undisputed Facts, ¶ 4.

Georgia, Iran, Iraq, Kazakhstan, Krygyzstan, Laos, Latvia, Libya, Lithuania, Macau, Moldova, Mongolia, North Korea, Romania, Russia, Sudan, Syria, Tajikistan, Turkmenistan, Ukraine, Uzbekistan or Vietnam. Def. Exh. J.

At all times relevant to this case, Defendant Csaba Szeles ("Szeles") was Rouse's direct supervisor, and the one who appraised his performance. For the period covering January 31, 2000, through January 31, 2001, it was determined that Rouse had performed at the level expected of him. Def. Exh. L. For the next period, which spanned from January 31, 2001, through January 31, 2002, Szeles reported as follows with respect to Rouse's performance:

> He fell a bit short on his first technical goal mainly because of insufficient dissemination of polishing proven development results. It is recommended that he puts [sic] more emphasis to the dissemination of his results in written reports, overview presentations and tutorials to the eV organization. He also need [sic] to continuously improve on research planning and project focus. Good progress in technical areas. Need [sic] improvement for communication and project management.

Def. Exh. M. These observations were recorded on March 1, 2002. *Id.* In an email to Szeles dated May 6, 2002, Defendant Bruce Glick ("Glick"), who was the Division Manager, expressed concerns about Rouse's performance. Def. Exh. K.

Szeles evaluated Rouse's performance for the following year on June 27, 2003. On that occasion, Szeles opined that Rouse needed to significantly improve his performance. Def. Exh. N. The performance appraisal was supplemented with a detailed examination of Rouse's performance signed by both Szeles and Rouse. Def. Exh. O. In addition to deficiencies related to specific scientific tasks, Szeles indicated that Rouse exhibited "insubordination to team goals," a "desire for individual projects and successes," "poor planning," and a "typical superficial 'chasing a dream' approach." Def. Exh. O, p. 5.

Rouse responded to these criticisms in writing. Def. Exh. P. After addressing the specific points raised in the performance evaluation, Rouse indicated that his disagreements with Szeles were attributable to the "intense passion" that they both shared for science. *Id.* Records at II-VI indicate that, because of the economic condition of the company, Rouse received no salary increase on January 31, 2003. Def. Exh. A. However, a notation dated April 30, 2003, indicates

that his salary was not increased due to "performance issues." *Id.*

Around this same period of time, Rouse was chastised by Szeles for unilaterally emailing a report to II-VI personnel. On January 31, 2003, Rouse forwarded to II-VI employees a report concerning "polishing and detector performance." Def. Exh. Q, p. 1. In an email to Rouse dated February 3, 2003, Szeles objected to Rouse's decision to release the report without a thorough review and discussion by the R&D group as a whole. *Id.* Szeles indicated that the eV organization's employees would be left with the impression that Rouse performed his research independently of the R&D group. *Id.* Alternatively, Szeles stated that Rouse's release of the report would lead to a misperception that the conclusions expressed therein represented the collective views of the R&D group, which was not the case. *Id.* Szeles concluded the email by saying that he and Rouse needed to discuss Rouse's "personal aspirations," "car[eer] objectives" and "work style," and how they were able to fit in with "the goals and operations of the eV team." *Id.*

On January 28, 2004, Rouse emailed Szeles a power point visual aid concerning process cleaning. Def. Exh. R, p. 1. Szeles apparently needed the information for a presentation that he was about to give before a manufacturing audience. *Id.* In a responsive email dated February 4, 2004, Szeles indicated that Rouse's draft, which was otherwise more extensive than necessary, did not include the specific information that was needed. *Id.*, pp. 1-2.

Rouse, Szeles and Glick had discussions on May 6, 2004, and May 14, 2004. Szeles and Glick documented their displeasure with Rouse's alleged lack of competence to function as a scientist for II-VI, which they indicated had been reflected by his comments during the discussions. Def. Exhs. S & T. On May 19, 2004, Rouse was informed that his employment with II-VI was being terminated. Def. Exh. KK. The employee separation record of II-VI indicates that Rouse's 30-day severance ended on June 18, 2004. *Id.*

On August 2, 2004, Rouse filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been terminated because of his race (i.e., black) and his age (i.e., 43). Def. Exh. Z. In the EEOC charge, Rouse stated that he had been informed of his discharge on May 19, 2004, at a meeting with Glick, Szeles and Human Resources Representative Kerry Courtney ("Courtney"). *Id.*

4

While the EEOC was processing his charge, Rouse filed a praecipe for a writ of summons against II-VI, Glick and Szeles in the Court of Common Pleas of Butler County, Pennsylvania. Under Pennsylvania law, this filing constituted the commencement of a civil action. *Pa. R. Civ. P. 1007.* The writ of summons was issued by the Butler County Prothonotary on May 17, 2005. Def. Exh. AA.

On June 16, 2005, Rouse filed a complaint against II-VI, Glick, Szeles and Courtney in the Court of Common Pleas of Allegheny County, Pennsylvania. Apparently, the complaint was amended several times. On Janurary 19, 2006, Rouse filed his fifth amended complaint, which asserted causes of action for intentional infliction of emotional distress, negligence with respect to his performance appraisals, negligent supervision, negligent failure to investigate, intentional interference with a prospective employment relationship, negligent retention, negligent training, and negligent failure to provide a safe working environment. Def. Exh. CC.

The EEOC issued a right to sue letter to Rouse on January 31, 2006. Def. Exh. HH. Meanwhile, Rouse's action in the Court of Common Pleas of Allegheny County continued to proceed. II-VI, Glick, Szeles and Courtney filed preliminary objections on February 6, 2006, and an oral argument was scheduled before Judge Judith Friedman. Def. Exh. DD. On March 9, 2006, after the oral argument, Judge Friedman dismissed Rouse's fifth amended complaint in its entirety. Def. Exh. EE. Rouse filed a notice of appeal to the Superior Court of Pennsylvania on April 10, 2006. Def. Exh. FF.

Rouse commenced this action against II-VI, Glick, Szeles and Courtney on April 28, 2006, asserting claims for violations of Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*], the Age Discrimination in Employment Act ("ADEA") [29 U.S.C. § 621 *et seq.*], the Pennsylvania Human Relations Act ("PHRA") [43 P.S. § 951 *et seq.*], 42 U.S.C. § 1981, and 42 U.S.C. § 1985(3). Complaint. Rouse also alleged that the Defendants had committed the torts of tortious interference with a contractual relationship, breach of contract, breach of fiduciary duty, fraudulent misrepresentation, civil conspiracy, and intentional infliction of emotional distress. *Id.* On September 11, 2006, the Defendants filed a motion to dismiss Rouse's claims against them.

The Superior Court dismissed Rouse's appeal on October 4, 2006, because of Rouse's

failure to file a brief. Def. Exh. GG. In a memorandum opinion and order dated March 30, 2007, this Court disposed of the Defendants' motion to dismiss, which was granted in part and denied in part. *Rouse v. II-VI Incorporated*, 2007 WL 1007925, 2007 U.S. Dist. LEXIS 23679 (W.D.Pa. March 30, 2007). After receiving leave to amend his complaint, Rouse filed an amended complaint in this action on July 10, 2007. Amended Complaint. Carl Johnson ("Johnson"), Marlene Acre ("Acre") and Francis Kramer ("Kramer") were added as defendants. Rouse also added a claim under the Employee Retirement Income Security Act ("ERISA") [29 U.S.C. § 1001 *et seq.*].

On August 17, 2007, the Butler County Prothonotary informed Rouse that his action in the Court of Common Pleas of Butler County was about to be terminated, since the docket had shown no activity for a period of two years. Def. Exh. BB. One month later, Rouse filed a Statement of Intention to Proceed, thereby forestalling the termination of that action. In an order dated November 16, 2007, Judge Marilyn Horan stated that if Rouse did not file a complaint within 30 days, his action in Butler County would be terminated. Def. Exh. LL.

The Defendants filed a motion for summary judgment in this case on November 30, 2007. This motion has been extensively briefed and is the subject of this memorandum opinion.

## Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-250.

## Discussion

### A. Res Judicata and Collateral Estoppel

In support of their motion for summary judgment, the Defendants contend that Counts 7, 8, 9, 10, 11, 12, 13, 14 and 15 of the amended complaint are barred by the doctrine of res judicata, and that Count 16 is barred by the doctrine of collateral estoppel.[2] Brief in Support of

---

[2]It is not clear to the Court why the Defendants do not rely on the doctrine of res judicata with respect to Count 16.

Motion for Summary Judgment, pp. 5-10. Counts 7 and 8 assert discrimination and retaliation claims under § 1981.[3] Amended Complaint, ¶¶ 113-125. Similarly, Counts 9 and 10 assert discrimination and retaliation claims under § 1985(3). *Id.*, ¶¶ 126-137. In Count 11, Rouse claims that Glick, Szeles, Courtney, Johnson, Acre and Kramer tortiously interfered with his contractual relationship with II-VI. *Id.*, ¶¶ 138-141. Count 12 is based on a theory of breach of contract, while Count 13 is based on a breach of fiduciary duty theory. *Id.*, ¶¶ 142-148. In Count 14, Rouse alleges that the Defendants committed the tort(s) of fraudulent misrepresentation and/or fraudulent inducement. *Id.*, ¶¶ 149-151. Count 15 is premised on a theory of civil conspiracy. *Id.*, ¶¶ 152-154. In Count 16, Rouse avers that the Defendants committed the tort of intentional infliction of emotional distress. *Id.*, ¶¶ 155-159. For the reasons that follow, none of these claims need be addressed on the merits.

Although the doctrine of res judicata has its origins in state law, the Full Faith and Credit Clause of the United States Constitution incorporates it as the law of our Union. *Riley v. New York Trust Co.*, 315 U.S. 343, 349 (1942)("By the Constitutional provision for full faith and credit, the local doctrines of *res judicata*, speaking generally, become a part of national jurisprudence, and therefore federal questions cognizable here.")(emphasis in original). That constitutional provision, however, speaks only in terms how "each State" is limited thereunder. U.S. CONST., art. IV, § 1. Thus, the Constitution itself does not require a federal court to honor the res judicata effects of a judgment rendered by a state court. Nevertheless, when a judgment is rendered by a state court, federal courts are statutorily bound by the doctrine of res judicata by virtue of 28 U.S.C. § 1738, which provides:

### § 1738.  State and Territorial statutes and judicial proceedings; full faith and credit

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within

---

[3]In *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1954-1961 (2008), the Supreme Court held that retaliation claims are cognizable under § 1981.

the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738. "This statute has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'" *San Remo Hotel, L.P. v. County of San Francisco*, 545 U.S. 323, 336 (2005). Consequently, in this case, the Court must give the judgment rendered by the Court of Common Pleas of Allegheny County the same preclusive effect that it would be accorded by a Pennsylvania court. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 293 (2005).

When this Court originally considered and ruled on the Defendants' motion to dismiss, it concluded that the doctrines of res judicata and collateral estoppel should not be applied in this case because the rationale of the Court of Common Pleas for dismissing Rouse's fifth amended complaint was not made available. *Rouse*, 2007 WL 1007925, at *3-6, 2007 U.S. Dist. LEXIS 23679, at *10-19. The Court had before it only Judge Friedman's order of March 9, 2006, which dismissed Rouse's fifth amended complaint. No indication was available as to *why* the case had been disposed of in that manner. The order was submitted to the Court as an exhibit to the Defendants' brief, but no judicial opinion was made a part of the record at that time. Def. Exh. E to Brief in Support of Motion to Dismiss. This time, however, the Defendants have submitted an opinion filed by Judge Friedman on June 27, 2006. Def. Exh. EE. The opinion had apparently been filed because Rouse had appealed Judge Friedman's decision to the Superior Court of Pennsylvania. The Defendants' motion to dismiss in this case was not filed until September 11, 2006. By that time, two and a half months had passed since the issuance of Judge Friedman's opinion. It is not clear why the opinion was not presented to the Court at that stage in the litigation. Nonetheless, the opinion having been presented to the Court for the purpose of the instant summary judgment, the issues of res judicata and collateral estoppel are back before the Court.

Rouse contends that the "law of the case" doctrine precludes reconsideration of these issues, since the Court has already resolved them in his favor. This argument is without merit. As an initial matter, the "law of the case" doctrine does not impose a limit on this Court's authority. Instead, it merely guides the Court's exercise of discretion in accordance with common judicial practice. *Castro v. United States*, 540 U.S. 375, 384 (2003); *Boll v. United States Army Corps of Engineers*, 255 F.Supp.2d 520, 527, n. 5 (W.D.Pa. 2003). The United States Court of Appeals for the Third Circuit has recognized that the "law of the case" doctrine should not be applied where there is (1) a change in the governing law; (2) new evidence presented; or (3) a need to prevent clear error or manifest injustice. *Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999). As noted earlier, the Court has evidence before it (i.e., Judge Friedman's opinion) that was not available when the Court ruled on the Defendants' motion to dismiss.[4] The authority discovered by the Court counsels against the application of the "law of the case" doctrine in this instance. *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 512, n. 3 (6th Cir. 2000)(recognizing new or "different" evidence as a reason not to apply the "law of the case" doctrine); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)(noting that interlocutory orders, such as the denial of a motion to dismiss, do not necessarily establish the "law of the case"); *Tse v. Ventana Medical Systems, Inc.*, 123 F.Supp.2d 213, 222 (D.Del. 2000)(recognizing that the "law of the case" doctrine does not preclude a grant of summary judgment in favor of a defendant whose motion to dismiss has previously been denied); *McIntyre v. Philadelphia Suburban Corp.*, 90 F.Supp.2d 596, 603, n. 5 (E.D.Pa. 2000)(same); *Conopco, Inc. v. McCreadie*, 826 F.Supp. 855, 867, n. 5 (D.N.J.

---

[4]Rouse points out that, when the Court rejected the Defendants' res judicata and collateral estoppel arguments on the ground that Judge Friedman's rationale for dismissing the fifth amended complaint was unclear, the Defendants did not file a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e). Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 7. The Court does not view that as significant. The Federal Rules of Civil Procedure contemplate that the record will be more fully developed at the summary judgment stage than it is at the motion to dismiss stage. Since the "law of the case" doctrine governs the exercise of judicial *discretion*, and does not limit the Court's *authority*, there is no bar to the Court's consideration of the Defendants' res judicata and collateral estoppel arguments at this stage. *Castro v. United States*, 540 U.S. 375, 384 (2003); *Boll v. United States Army Corps of Engineers*, 255 F.Supp.2d 520, 527, n. 5 (W.D.Pa. 2003). It would hardly be an exercise of sound judicial discretion for the Court to hold, as Rouse advocates, that the Defendants should be forced to relitigate previously adjudicated claims merely because the Court, at a prior stage in the litigation, was unaware of the existence of Judge Friedman's opinion.

1993)(observing that the "law of the case" doctrine is inapplicable where evidence that was not available at the time of the denial of a motion to dismiss becomes available at the summary judgment stage). A motion for summary judgment, which is filed on the basis of a developed record, serves a different function than a motion to dismiss, which is filed before the commencement of discovery. *Behrens v. Pelletier*, 516 U.S. 299, 305-313 (1996). Consequently, the Court is convinced that the "law of the case" doctrine does not prevent the Defendants from raising their defenses of res judicata and collateral estoppel at this stage of the proceeding.

Having determined that the issue of res judicata can be reexamined at this stage, the Court must give Judge Friedman's decision the same preclusive effect that it would be accorded by a Pennsylvania state court. *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006). In *Balent v. City of Wilkes-Barre*, 669 A.2d 309 (Pa. 1995), the Pennsylvania Supreme Court explained:

> *Res judicata*, or claim preclusion, is a doctrine by which a former adjudication bars a later action on all or part of the claim which was the subject of the first action. Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action. *Allen v. McCurry*, 449 U.S. 90, 94, 66 L.Ed.2d 308, 101 S.Ct. 411 (1980). *Res judicata* applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action. *Id.*

*Balent*, 669 A.2d at 313 (emphasis in original). It is undisputed that the basis for Rouse's action in the Court of Common Pleas of Allegheny County, a court of competent jurisdiction, was the same termination decision at issue in this case. *Turner*, 449 F.3d at 548 (recognizing that, in order for one action to have res judicata effect in another, there must be an identity of "the thing sued upon or for"). There is also no question that this action involves the same parties (as well as some privies to those parties) as the action in the Court of Common Pleas. *Id.* (listing the identity of "the persons and parties to the action" as a necessary element for the application of res judicata). What is primarily at issue is (1) whether the action in the Court of Common Pleas involved the same "cause of action" as the instant action; (2) whether the parties had the capacities to sue or be sued in the Court of Common Pleas; and (3) whether the litigation in the

Court of Common Pleas resulted in a decision on the merits. *Id.* (recognizing these factors as necessary to the res judicata inquiry). Because these issues are interrelated, the Court will discuss them together.

In determining whether two lawsuits involve the same cause of action, the Court's primary focus concerns the question of "whether the primary right and duty, and delict or wrong, are the same in each action." *Dempsey v. Cessna Aircraft Co.*, 653 A.2d 679, 681 (Pa.Super.Ct. 1995)(en banc), quoting 46 Am.Jur.2d, *Judgments*, § 406. Where such parity exists, the two suits involve the same "cause of action." *Id.* ("Under this test, there is but one cause of action where there is but one right in the plaintiff and one wrong on the part of the defendant involving that right."). Generally speaking, this inquiry turns on (1) whether the factual allegations in both actions are the same, (2) whether the same evidence is necessary to prove such allegations, and (3) whether both actions seek compensation for the same damages. *Kelly v. Kelly*, 887 A.2d 788, 792 (Pa.Super.Ct. 2005). "Res judicata may bar a second action based upon the same transaction even if additional grounds for relief are presented." *Dempsey*, 653 A.2d at 682. Thus, identity of the relief sought is *not* a prerequisite to the application of res judicata. *Id.* ("That appellant sought monetary damages in the federal court but requested equitable relief in the nature of rescission in the state court does not change the fact that he had a single cause of action."). It is clear that these factors all point to the conclusion that this suit involves the same cause of action as the suit in the Court of Common Pleas. Indeed, the Court does not understand Rouse to argue otherwise. Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, pp. 4-8. Therefore, further examination of that issue is unnecessary.

The next issue for consideration is whether the parties had the capacities to sue or be sued in the Court of Common Pleas. The Defendants correctly point out that Rouse encountered no jurisdictional obstacle to the pursuit of his § 1981 and § 1985(3) claims in the Pennsylvania state court.[5] Brief in Support of Motion for Summary Judgment, p. 7, n. 1; *Grier v. Galinac*, 740

---

[5]In *Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820, 821-826 (1990), the Supreme Court held that state courts have concurrent jurisdiction over Title VII actions. Speaking through Justice Stevens, the Supreme Court unanimously declared that, "[t]o give federal courts exclusive jurisdiction over a federal cause of action, Congress must, in an exercise of its powers under the Supremacy Clause, affirmatively divest state courts of their presumptively concurrent jurisdiction." *Donnelly*, 494 U.S. at 823. There is no indication in the language of § 1981 or § 1985(3) that Congress intended to affirmatively divest state courts of their concurrent jurisdiction to entertain

F.Supp. 338, 341, n. 2 (M.D.Pa. 1990)(recognizing that state courts have concurrent jurisdiction over § 1981 claims). It is axiomatic that the Court of Common Pleas had jurisdiction to entertain Counts 11, 12, 13, 14 and 15, since they assert claims which arose under Pennsylvania law. Amended Complaint, ¶¶ 138-154. Absent a jurisdictional bar, the parties had the capacities to sue and be sued in accordance with res judicata principles under Pennsylvania state law. *Turner*, 449 F.3d at 550. Since no jurisdictional bar was present, the "capacities" inquiry must be resolved in favor of the Defendants.

The remaining question is whether Judge Friedman rendered a decision on the merits in Rouse's case. This is the issue upon which Rouse appears to focus his arguments. As noted earlier, the "law of the case" doctrine does not preclude consideration of this issue, notwithstanding the Court's earlier determination (or assumption) that no decision on the merits had been made. Indeed, the Court acknowledged that the doctrine of res judicata would be applicable in this case upon a showing by the Defendants that Judge Friedman had, in fact, reached and decided the merits of Rouse's claims. *Rouse*, 2007 WL 10007925, at *4, 2007 U.S. Dist. LEXIS 23679, at *12-13 ("Thus, if the Court of Common Pleas had clearly dismissed Plaintiff's claims on the basis of a demurrer, the order would be res judicata with respect to any further claims by plaintiff that could have been brought in the state court proceeding."). Under Pennsylvania law, the sustainment of preliminary objections in the nature of a demurrer is a *final* order subject to appeal. *United States National Bank v. Johnson*, 487 A.2d 809, 813 (Pa. 1985).

With Judge Friedman's opinion now before it, the Court is able to determine whether the doctrine of res judicata operates as a bar to Counts 7, 8, 9, 10, 11, 12, 13, 14 and 15. The Court of Common Pleas sustained the Defendants' preliminary objections in an order dated March 9, 2006, which dismissed Rouse's fifth amended complaint in its entirety. Def. Exh. EE. Rouse filed a notice of appeal to the Pennsylvania Superior Court on April 10, 2006. Def. Exh. FF. In

---

actions under those statutes. Hence, the Court of Common Pleas had jurisdiction to entertain Rouse's claims under § 1981 and § 1985(3). As noted earlier, the Court does not understand why the Defendants do not include Count 16, which is based on the tort of intentional infliction of emotional distress, within their res judicata argument. They rely on the related, but distinct, doctrine of collateral estoppel in support of their motion for summary judgment with respect to Count 16. Brief in Support of Motion for Summary Judgment, pp. 9-10. The Defendants apparently do not raise the defense of res judicata with respect to Rouse's Title VII, ADEA and PHRA claims because such claims had not yet been exhausted when he commenced his action in the Court of Common Pleas on June 16, 2005.

response to the appeal, Judge Friedman issued her opinion on June 27, 2006. Def. Exh. EE. In the opinion, she explained that Rouse's intentional infliction of emotional distress claim could not proceed because, under Pennsylvania law, stress resulting from the termination of an "at will" employment relationship is not compensable even where such termination is based on erroneous information. *Id.* Rouse asserted that the Defendants had incorrectly evaluated his performance, but the Court of Common Pleas concluded that this must also be dismissed because he had not pleaded facts to establish an exception to Pennsylvania's "at will" employment principles.[6] *Id.* Rouse's claim for negligent supervision was dismissed on the ground that Pennsylvania law does not recognize such a cause of action under the facts pleaded in the fifth amended complaint. *Id.* Although Rouse argued that II-VI had not adequately investigated the reasons behind the decision to terminate him, Judge Friedman ruled that Pennsylvania law does not impose on an employer the duty to investigate the validity of a supervisor's basis for discharging a subordinate. *Id.* It was also determined that Rouse had no "right" under Pennsylvania law to receive a reference from his former employer. *Id.* Rouse alleged that II-VI should have fired Glick, Szeles and Courtney for their handling of his dismissal, but the Court held that he had no standing to complain about the treatment by II-VI of other employees. *Id.* Judge Friedman rejected Rouse's negligent training claim on the ground that II-VI had no *legal* duty to train its employees to properly perform performance evaluations. *Id.* Rouse asserted a claim for the alleged negligent failure of II-VI to provide a safe work environment, but the Court concluded that the emotional distress alleged by Rouse resulted only from an "unpleasant," rather than from an "unsafe," work environment. *Id.* Given this analysis, it is clear that Judge Friedman dismissed Rouse's claims on their respective merits rather than because of procedural technicalities.

In the prior opinion, this Court partially based its decision not to apply the doctrine of res judicata on the potentiality that Judge Friedman had dismissed the fifth amended complaint *because* Rouse had commenced both this action and an action in Butler County. *Rouse*, 2007 WL 10007925, at *4-6, 2007 U.S. Dist. LEXIS 23679, at *13-18. Nevertheless, Judge

---

[6]Under Pennsylvania's system of fact pleading, "the pleader must define the issues and every act or performance essential to that end must be set forth in the complaint." *Cable & Associates Insurance Agency, Inc. v. Commercial National Bank of America*, 875 A.2d 361, 365 (Pa.Super.Ct. 2005).

Friedman's opinion makes it clear that the action in Butler County was not relied upon as a basis for dismissing Rouse's claims. Def. Exh. EE. Although Judge Friedman acknowledged the pendency of the Butler County action, she did not rely on it as a basis for dismissing the fifth amended complaint. *Id.* Thus, the reasons previously ascribed by this Court for not applying the doctrine of res judicata have all been rendered moot by the Defendants having provided Judge Friedman's opinion.[7]

Rouse argues that the decision rendered by the Court of Common Pleas should not be given preclusive effect because the Superior Court did not reach the merits of his appeal. Brief in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, pp. 5-6. The Superior Court dismissed Rouse's appeal because of his failure to file a brief. Def. Exh. GG. This action was consistent with Pennsylvania Rule of Appellate Procedure 2101, which permits an appellate court to dismiss or quash an appeal when an appellant substantially fails to conform to the applicable rules governing the filing and content of briefs and records. *Pa. R. App. P. 2101.* The Superior Court has made it clear that it will not act as counsel for pro se litigants. *Beach Banking & Trust v. Gesiorski*, 904 A.2d 939, 942-943 (Pa.Super.Ct. 2006). The dismissal of Rouse's appeal was due to his own failure to file a brief. The Court cannot conclude that this action by the Superior Court operated to deprive Judge Friedman's decision of its res judicata

---

[7]Rouse apparently abandoned his breach of contract claim. He originally asserted a claim based on the alleged failure of II-VI to comply with the requirement that he remain an employee for 30 days after receiving notice of the termination decision. Def. Exh. EE. Judge Friedman indicated that Rouse had opted not to pursue it. *Id.* She also observed that Rouse was pursuing this action, in light of the EEOC's issuance of a right to sue letter. *Id.* There is no indication that the pendency of this action was relied upon as a basis for dismissing Rouse's breach of contract claim. Rouse argues that he opted to "reserve" that claim so that it could be pursued in federal court. Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 7. This argument is unavailing. The Supreme Court has recognized that a plaintiff who initially commences an action in a federal court may reserve his or her *federal* claims for resolution in that federal court if abstention is necessary for the purpose of permitting a state court to resolve issues of state law applicable to the case. *San Remo Hotel, L.P. v. County of San Francisco*, 545 U.S. 323, 338-341 (2005). Such circumstances are not present here. Rouse's breach of contract claim arises under Pennsylvania law, not under federal law. In addition, his action in the Court of Common Pleas was commenced *prior* to, rather than *subsequent* to, the commencement of this action. Although that claim was not addressed on the merits, it is subject to the same res judicata effect as Rouse's claims under § 1981 and § 1985(3), which were never pursued in the Court of Common Pleas. If it were otherwise, a plaintiff could relitigate the same case repeatedly, under multiple theories of liability, by simply reserving all other claims for subsequent litigation commenced within the applicable limitations period. Of course, the doctrine of res judicata would be inapplicable if none of Rouse's claims had been decided on the merits. Nevertheless, Rouse cannot avoid the mandate of § 1738, and the corresponding application of res judicata, merely by choosing to abandon a claim that could have been pursued in the Court of Common Pleas.

effect.

Admittedly, Pennsylvania adheres to the rule that "an appeal creates a clean slate" for purposes of res judicata. *Speyer, Inc. v. Goodyear Tire & Rubber Co.*, 295 A.2d 143, 146 (Pa.Super.Ct. 1972). This is primarily because "there is only one judgment in a case–the ultimate judgment, which is that of the appellate court." *Id.* In this case, however, the *ultimate* judgment was that rendered by the Court of Common Pleas, since Rouse neglected to pursue the appeal which he had filed. Having litigated his case in a Pennsylvania court, Rouse's vehicle to remedy any resulting errors was to pursue his appeal. There was no obstacle to the Superior Court's resolution of the substantive issues in Rouse's case. Our system of dual sovereignty contemplates that litigants will proceed with their cases through the appellate hierarchy. Indeed, Congress has provided litigants in state courts with a mechanism to petition the United States Supreme Court for a writ of certiorari, thereby ensuring that the final word on questions of federal law remains with the "one supreme Court" referenced in Article III of the United States Constitution. 28 U.S.C. § 1257(a). Congress, of course, retains the authority to provide "Tribunals inferior to the supreme Court" with jurisdiction to review certain judgments rendered by state courts. *Exxon Mobil Corp.*, 544 U.S. at 292, n. 8 ("Congress, if so minded, may explicitly empower district courts to oversee certain state-court judgments and has done so, most notably, in authorizing federal habeas review of state prisoners' petitions."). As a general matter, however, this Court does not sit as an appellate court available to those aggrieved by judgments rendered by state tribunals. A litigant such as Rouse cannot escape the res judicata effects of an adverse judgment by the simple expedient of depriving the Superior Court of a meaningful opportunity to reach and determine the merits of his case. *Underwriters National Assurance Co. v. North Carolina Life & Accident & Health Insurance Guaranty Association*, 455 U.S. 691, 710 (1982)("A party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding."). The decision of the Court of Common Pleas was not *set aside* on appeal. Consequently, its res

judicata effects remain in place.[8]  *Commonwealth v. Fox*, 124 A.2d 628, 631 (Pa.Super.Ct. 1956)("Unless *set aside* on appeal, the matter becomes res judicata.")(emphasis added).

Because the failure of the Superior Court to reach the merits of Rouse's appeal resulted from Rouse's own failure to file a brief, the Court is convinced that Pennsylvania law would accord Judge Friedman's decision the same res judicata effect to which it would have been entitled had no appeal ever been filed.  That decision is entitled to "the same full faith and credit" in this Court that it would be accorded in a Pennsylvania state court.  28 U.S.C. § 1738. Accordingly, the Defendants are entitled to summary judgment with respect to Counts 8, 9, 10, 11, 12, 13, 14 and 15 of the amended complaint, which are barred by the doctrine of res judicata.

The Defendants contend that Count 16, which is based on the tort of intentional infliction of emotional distress, is barred by the doctrine of collateral estoppel.  It is unclear to the Court why Defendants do not include Count 16 within their res judicata argument.  Nevertheless, the doctrine of collateral estoppel compels the same result.  As noted earlier, § 1738 requires this Court to give Judge Friedman's decision the same preclusive effect that it would be accorded by a Pennsylvania court.  This remains true when the issue involves collateral estoppel, or issue preclusion, rather than res judicata, or claim preclusion.  *Turner*, 449 F.3d at 551, n. 15 ("We note that collateral estoppel, known as issue preclusion, also likely bars Turner's action.").  In order for the doctrine of collateral estoppel to preclude the relitigation of an issue, (1) an identical issue must have been decided in a prior proceeding; (2) there must have been a final judgment on the merits; (3) the party against whom collateral estoppel is asserted must have been either a party or in privity with a party to the prior adjudication; (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior action; and (5) the determination in the prior proceeding must have been essential to the judgment.  *R.W. v. Manzek*, 888 A.2d 740, 748 (Pa. 2005); *Folino v. Young*, 568 A.2d 171, 174 (Pa. 1990).

In her opinion, Judge Friedman gave the following explanation for dismissing the claim

---

[8]The Court is not faced with a situation in which an appellate court, by relying on an alternative ground to affirm a decision, has effectively deprived a litigant of a meaningful opportunity to appeal an erroneous determination.  If such a circumstance were present, the applicability of res judicata would be in serious doubt. *Speyer, Inc. v. Goodyear Tire & Rubber Co.*, 295 A.2d 143, 145-146 (Pa.Super.Ct. 1972).

for intentional infliction of emotional distress alleged by Rouse:

> Plaintiff complains that his firing caused him emotional distress. However, in Pennsylvania, employees are "at will" absent an express contract to the contrary. Any resultant stress is not compensable in Pennsylvania even where the firing was based on wrong information.

Def. Exh. EE. Rouse appears to take issue with this determination, arguing that he had contended, at the oral argument, that he was not an "at will" employee, and that the Court of Common Pleas was required to accept his allegations as true at that stage in the litigation. Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, pp. 6-7. The applicability of collateral estoppel, however, is not dependent upon the correctness of the original adjudication. *Underwriters National Assurance Co.*, 455 U.S. at 709, n. 16 ("As we have consistently held, the fact that the rendering court may have made an error of law with respect to a particular question does not deprive its decision of the right to full faith and credit, so long as that court fully and fairly considered its jurisdiction to litigate the issue."). Even if Rouse's argument is correct as to the substantive issue, the doctrine of collateral estoppel nevertheless bars him from relitigating that issue in this forum.[9] The Court of Common Pleas held that, under the circumstances alleged by Rouse, Pennsylvania law did not provide a remedy for his emotional distress. Rouse cannot relitigate that issue here. The decision of the Court of Common Pleas constituted a final judgment on the merits in the prior action, and Rouse (i.e., the party against whom collateral estoppel is asserted) was a party to that action. Rouse had a full and fair *opportunity* to litigate the issue in the Pennsylvania state courts. *R.W.*, 888 A.2d at 748. His failure to pursue his appeal in the Superior Court, of course, does not alter this Court's collateral estoppel analysis any more than it alters the applicable res judicata analysis. Judge Friedman's determination as to this issue was essential to her judgment, since Rouse's intentional infliction of emotional distress claim would not have been dismissed at the preliminary objection stage had the fifth amended complaint alleged facts which would have entitled Rouse to relief under Pennsylvania law. Consequently, it is clear that Count 16 of the

---

[9]The Court does not mean to suggest that the decision of the Court of Common Pleas was erroneous. The point is that the correctness (or incorrectness) of that decision is irrelevant to the collateral estoppel inquiry.

Complaint is barred by the doctrine of collateral estoppel. The Court must grant the Defendants'

motion for summary judgment with respect to Count 16 of the Complaint.

## B. Discrimination

Rouse's remaining federal claims arise under Title VII, the ADEA and the ERISA.[10]

Rouse also alleges violations of the PHRA for discrimination on the basis of race and age. As a

general matter, the Pennsylvania courts interpret the PHRA in accordance with Title VII and the

ADEA. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996). For this reason, the

provisions of the PHRA are typically construed to be coextensive with their federal counterparts

unless the relevant statutory language of the PHRA indicates that a different construction is

warranted. *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). There is no

indication that the substantive application of the PHRA in this case differs from that of its federal

counterparts.[11] Therefore, the Court's discussion regarding Rouse's claims under Title VII and

the ADEA will also be dispositive of his claims under the PHRA for race and age discrimination.

Before proceeding to the facts of this case, the Court takes note of a few preliminary

points. Since this is an employment discrimination case in which no direct evidence of

discrimination is being presented, the Supreme Court's analyses in *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S.

248 (1981), provide the formulation for allocating the requisite burdens of proof and production

for the purpose of the instant motion for summary judgment. In a federal employment

discrimination case such as this, the plaintiff must establish a prima facie case of forbidden

---

[10]The Court will not address the merits of Rouse's claims under § 1981 and § 1985(3), since those claims are barred by the doctrine of res judicata.

[11]The Court acknowledges that Rouse's PHRA claims, unlike his Title VII and ADEA claims, are asserted against the individual defendants as well as against II-VI. Amended Complaint, ¶¶ 93, 99. Section 955(e) of the PHRA makes it an "unlawful discriminatory practice" "[f]or any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by [the PHRA] to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of [the PHRA] or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by [the PHRA] to be an unlawful discriminatory practice." 43 P.S. § 955(e). This provision has been construed to provide for individual liability. *Nolan v. Duffy Connors, LLP*, 542 F.Supp.2d 429, 432 (E.D.Pa. 2008); *Holocheck v. Luzerne County Head Start, Inc.*, 385 F.Supp.2d 491, 496-497 (M.D.Pa. 2005). Nonetheless, independent of the issue of individual liability, the substantive prohibitions contained in the PHRA do not differ from those contained in Title VII or the ADEA in any way material to this case.

discrimination. *McDonnell Douglas*, 411 U.S. at 802. If a prima facie case is established, the defendant must articulate a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment. *Id.* at 802-803. If the defendant articulates such a reason, the plaintiff must demonstrate that the reason given by the defendant for the plaintiff's treatment is merely a pretext for illegal employment discrimination. *Id.* at 804-805. Evidence that an employer's stated reasons for an adverse employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

The requirement that the plaintiff establish a prima facie case of unlawful discrimination under the applicable statutory provisions "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), cert. denied, 515 U.S. 1159 (1995). A prima facie case raises an inference of unlawful discrimination because the courts presume that the challenged actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Id.* Nevertheless, it must be remembered that the *McDonnell Douglas-Burdine* framework "was never intended to be rigid, mechanized, or ritualistic." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978). This is especially true with respect to the plaintiff's need to establish a prima facie case. In *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the Court of Appeals for the Third Circuit made it clear that "the elements of a prima facie case depend on the facts of the particular case[,]" and that "a prima facie case cannot be established on a one-size-fits-all basis." Thus, "the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003).

The *McDonnell Douglas-Burdine* framework does not apply in employment discrimination cases in which there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Direct evidence of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). In cases in which direct evidence of discrimination is presented, there is no need for an "inference" of discrimination, since the discrimination itself is

transparent. In this case, however, Rouse has presented no direct evidence of discrimination.

In order to establish a prima facie case of race discrimination under Title VII or age discrimination under the ADEA with respect to his discharge, Rouse must show that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) his discharge occurred under circumstances giving rise to an inference of race or age discrimination.[12] With that in mind, the Court now turns to the applicable statutory language.

The relevant portion of Title VII provides:

### § 2000e-2. Unlawful employment practices

**(a) Employer practices.** It shall be an unlawful employment practice for an employer--

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). II-VI does not dispute that it is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.]" 42 U.S.C. § 2000e(b).

---

[12]The Court recites the elements of a prima facie case in a general manner in order to accommodate differing factual settings and theories of liability. Although courts often state the elements in Title VII cases in such a way as to require the plaintiff to show that he or she was replaced by someone outside of the protected class, such a showing is not always necessary. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353 (3d Cir. 1999)("Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class–which in the present context is presumably true of all but the most misogynistic employers–and does not establish that the employer did not fire the plaintiff on the basis of her protected status."). Moreover, while courts often state that a plaintiff in an ADEA case must show that he or she was treated differently than someone who was both similarly situated and sufficiently younger, such a showing need not be made if other case-specific evidence exists which tends to create an inference of age discrimination. *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491-492, n. 4 (M.D.Pa. 2005). The touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313 (1996).

Therefore, II-VI is an "employer" within the meaning of Title VII.[13]  It is likewise undisputed that Rouse, at the time of his discharge, was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

The relevant portion of the ADEA provides:

**§ 623.  Prohibition of age discrimination**

**(a) Employer practices.**  It shall be unlawful for an employer--
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
(3) to reduce the wage rate of any employee in order to comply with this Act.

29 U.S.C. § 623(a).  II-VI does not dispute that it is "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.]" 29 U.S.C. § 630(b).  Consequently, it is an "employer" within the meaning of the ADEA.  At the time of his discharge, Rouse was an "employee" under 29 U.S.C. § 630(f).  The prohibitions contained in the ADEA are "limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).  Hence, only those 40 years of age and over may invoke the protections of the ADEA.[14]  In order to establish a violation of the ADEA, Rouse must establish that his age "actually motivated" II-VI's decision to discharge him. *Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 512 (3d Cir. 2004).  This means

---

[13]Title VII imposes liability on "employers" rather than on individual supervisors. *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 183-184 (3d Cir. 1997); *Barb v. Miles, Inc.*, 861 F.Supp. 356, 359 (W.D.Pa. 1994).  The Court notes that Rouse's Title VII and ADEA claims are asserted only against II-VI.  Amended Complaint, ¶¶ 80, 86, 106, 112.

[14]The ADEA only prohibits discrimination in one direction (i.e., discrimination which favors the young at the expense of the old).  It does not prohibit employers from discriminating against younger individuals.  In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 594-600 (2004), the Supreme Court held that the words "because of such individual's age," as they appear in 29 U.S.C. § 623(a)(1), essentially mean "because of such individual's [old or advanced] age."

that he must show that his age actually played a role in II-VI's decisionmaking process and "had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000).

The Civil Rights Act of 1991 added the following language, which is codified at 42 U.S.C. § 2000e-2(m), to Title VII:

> **(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices.** Except as otherwise provided in this title [42 U.S.C. § 2000e *et seq.*], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m); Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075 (1991).[15]  In *Desert Palace v. Costa*, 539 U.S. 90 (2003), the Supreme Court held that a plaintiff need not present "direct evidence" of discrimination in order to obtain a "mixed-motive" instruction under § 2000e-2(m), and that a court may give such an instruction where the plaintiff has presented "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Desert Palace*, 539 U.S. at 101 (internal quotation marks omitted).  Since a showing that Rouse's race was a motivating factor in II-VI's decision to discharge him would suffice to sustain a jury's finding of an "unlawful employment practice," such a showing would also be sufficient to defeat II-VI's motion for summary judgment.[16]  "After all, the summary judgment

---

[15]By its very terms, § 2000e-2(m) applies only to discrimination based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(m).  Thus, it has no application to ADEA claims.  *Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 512, n. 3 (3d Cir. 2004).

[16]In *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 220 (3d Cir. 2000), the Court of Appeals for the Third Circuit held that § 2000e-2(m) did not alter the pre-existing distinction between "pretext" cases and so-called "mixed-motive" cases, and that plaintiffs proceeding under a "pretext" theory of discrimination were not relieved of their burden to show that the forbidden discriminatory criterion was a *determinative* (rather than merely a *motivating*) factor behind the employment practice alleged to be unlawful. Concluding that § 2000e-2(m) had overruled only the portion of Justice O'Connor's concurrence in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), holding that an employer could avoid a finding of liability by establishing that it would have made the same employment-related decision even if it had not considered the impermissible criterion, the Court of Appeals distinguished between "pretext" cases and "mixed-motive" cases by reference to Justice O'Connor's "direct evidence" requirement.  *Watson*, 207 F.3d at 212-220.  This reasoning was squarely rejected by the Supreme Court in *Desert Palace v. Costa*, 539 U.S. 90, 98 (2003)("Like the Court of

inquiry is inextricably linked with what a reasonable *jury* could or could not decide, which can only be determined by reference to *what* the jury may ultimately be asked to consider." *Vereen v. Woodland Hills School District*, 2008 WL 794451, at *19, 2008 U.S. Dist. LEXIS 23075, at *53 (W.D.Pa. March 24, 2008)(emphasis in original). It is axiomatic that virtually all cases in which a forbidden discriminatory criterion is a *determinative* factor in an employment decision will satisfy the more lenient *motivating* factor standard applicable under § 2000e-2(m), but not all cases which satisfy the *motivating* factor standard will satisfy the more demanding *determinative* factor standard. Consequently, at the summary judgment stage, this Court will consider the standard applicable under § 2000e-2(m), which is the lowest common denominator between the two alternatives.[17] *Houser v. Carpenter Technology Corp.*, 216 Fed.Appx. 263, 265 (3d Cir.

---

Appeals, we see no need to address which of the opinions in *Price Waterhouse* is controlling: the third step of petitioner's argument is flawed, primarily because it is inconsistent with the text of § 2000e-2(m).").  Since "direct evidence" is *not* required in order for a plaintiff to obtain a "mixed-motive" jury instruction under § 2000e-2(m), it is now clear that § 2000e-2(m) is applicable to at least *some* (if not *all*) of the so-called "pretext" cases referenced by the Court of Appeals in *Watson* (i.e., cases in which no "direct evidence" of discrimination is presented). *Desert Palace* did not address the question of whether § 2000e-2(m) eradicated the distinction between "pretext" cases and "mixed-motive" cases, or whether it is applicable to "pretext" cases if such a distinction still exists. *Desert Palace*, 539 U.S. at 94, n. 1 ("This case does not require us to decide when, if ever, § 107 applies outside of the mixed-motive context.").  Nevertheless, before *Desert Palace*, the Court of Appeals had assumed that these two categories of cases were mutually exclusive, using the "direct evidence" line of demarcation to distinguish between them. *Watson*, 207 F.3d at 218 ("By contrast, the term 'demonstrates' is not the most apt choice if the drafters wanted to describe, not just the cases in which the plaintiff offers 'direct' evidence of discriminatory animus, but also the great number of disparate treatment cases in which the plaintiff, proceeding under *McDonnell Douglas*, establishes the elements of a prima facie case and urges the factfinder to infer discriminatory animus from the employer's asserted failure to offer a credible alternative reason for the contested employment action.").  It would make little sense for the Court to hold, in the aftermath of *Desert Palace*, that § 2000e-2(m) applies only where a plaintiff *concedes* that permissible factors (in addition to impermissible factors) influenced the challenged employment decision.  The existence or nonexistence of an unlawful employment practice is not dependent upon the theory advanced by a plaintiff challenging that practice. *Quantum Chemical Corp. v. Toennies*, 47 S.W.3d 473, 478 (Tex. 2001)("Establishing an unlawful employment practice is, of course, the entire point of a plaintiff's suit, no matter how it is judicially classified.").  An employment practice either does or does not violate Title VII when it *occurs*. The only logical reading of *Desert Palace* is that plaintiffs such as Rouse, who have no "direct evidence" of discrimination, can still benefit from § 2000e-2(m)'s relaxed standard.  Indeed, that was the *holding* in *Desert Palace*.  If any Title VII discrimination cases are outside of § 2000e-2(m)'s scope, it is not clear how such cases should be identified.  Prior to 2003, such cases were identified by reference to the "direct evidence" requirement, which has since been rejected by the Supreme Court as the applicable benchmark. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995)(distinguishing between "pretext" cases and "mixed-motive" cases by reference to whether "direct evidence" of discrimination was present).

[17]Although not directly relevant to the Court's analysis at this stage, it is noteworthy that 42 U.S.C. § 2000e-5(g)(2)(B) provides a partial affirmative defense for an employer able to establish that it "would have taken the same action in the absence of the impermissible motivating factor[.]" 42 U.S.C. § 2000e-5(g)(2)(B).  Upon such a showing, a court can still grant declaratory and injunctive relief, as well as "attorney's fees and costs demonstrated

2007)(declining to address whether a "mixed-motive" analysis was proper at the summary judgment stage because the plaintiff could not satisfy the "motivating factor" test in any event).

In order to prevail under Title VII or the ADEA, Rouse must show that II-VI discharged him *because* of his race, or *because* of his age.[18]  He cannot prevail merely by showing that the termination decision was otherwise unjustified.  The question is whether II-VI engaged in discriminatory practices prohibited under federal law, not whether II-VI is "wise, shrewd, prudent or competent."  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  The evidence, of course, must be viewed in the light most favorable to Rouse.  Nonetheless, in order to proceed to trial, Rouse must present sufficient evidence to enable a reasonable jury to conclude that he was discharged because of his *race*, or because of his *age*.[19]  42 U.S.C. § 2000e-2(a); 29 U.S.C. §

---

[18]The Court acknowledges that Rouse appears to challenge more than simply II-VI's decision to discharge him.  Amended Complaint, ¶ 78.  Nevertheless, the Court has already determined that any claims based on conduct occurring before October 2, 2003, must be dismissed.  *Rouse v. II-VI Incorporated*, 2007 WL 1007925, at *8, 2007 U.S. Dist. LEXIS 23679, at *23 (W.D.Pa. March 30, 2007).  The only conduct alleged to have occurred after that date concerned Rouse's discharge, which he alleges to have been precipitated by a conspiracy against him.  Amended Complaint, ¶¶ 55-62.

[19]It is firmly established that state courts have concurrent jurisdiction to entertain actions brought under Title VII.  *Raygor v. Regents of the University of Minnesota*, 534 U.S. 533, 554, n. 15 (2002)(Stevens, J., dissenting); *Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820, 821-826 (1990); *Lassiter v. LabCorp Occupational Testing Services, Inc.*, 337 F.Supp.2d 746, 751 (M.D.N.C. 2004); *Hirschbiel v. Johnson*, 118 F.Supp.2d 903, 904-905 (N.D.Ind. 2000).  A similar rule applies to ADEA claims.  29 U.S.C. § 626(c)("Any person aggrieved may bring a civil action in *any court of competent jurisdiction* for such legal or equitable relief as will effectuate the purposes of this Act . . .")(emphasis added).  The Court of Common Pleas had the legal competence to entertain Rouse's Title VII and ADEA claims.  *Bailey v. Storlazzi*, 729 A.2d 1206, 1209, n. 3 (Pa.Super.Ct. 1999)(recognizing that Pennsylvania courts enjoy concurrent jurisdiction over Title VII claims).  Rouse's fifth amended complaint was filed in the Court of Common Pleas on January 19, 2006.  Def. Exh. CC.  The EEOC issued Rouse a right to sue letter on January 31, 2006.  Def. Exh. HH.  The Defendants filed their preliminary objections to the fifth amended complaint on February 6, 2006.  Def. Exh. DD.  It is unclear whether Rouse, after receiving his right to sue letter, would have been able to amend his complaint a sixth time in order to add his Title VII and ADEA claims.  There is some authority supporting the idea that he would have been obliged to do so if at all possible, and that his failure to do so should result in such claims being barred by the doctrine of res judicata.  *Heyliger v. State*

2007)(declining to address whether a "mixed-motive" analysis was proper at the summary judgment stage because the plaintiff could not satisfy the "motivating factor" test in any event).

In order to prevail under Title VII or the ADEA, Rouse must show that II-VI discharged him *because* of his race, or *because* of his age.[18]  He cannot prevail merely by showing that the termination decision was otherwise unjustified.  The question is whether II-VI engaged in discriminatory practices prohibited under federal law, not whether II-VI is "wise, shrewd, prudent or competent."  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  The evidence, of course, must be viewed in the light most favorable to Rouse.  Nonetheless, in order to proceed to trial, Rouse must present sufficient evidence to enable a reasonable jury to conclude that he was discharged because of his *race*, or because of his *age*.[19]  42 U.S.C. § 2000e-2(a); 29 U.S.C. §

---

to be directly attributable only to the pursuit of a claim" under § 2000e-2(m), but may not "award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment[.]" 42 U.S.C. § 2000e-5(g)(2)(B)(i)-(ii); *Desert Palace*, 539 U.S. at 94-95.  In the amended complaint, Rouse seeks the costs and expenses of this litigation, counsel fees, and further "equitable relief as the Court may deem just and proper."  Amended Complaint, ¶ 167(j)-(k).  The Court does not understand his request for counsel fees, since he is proceeding on a pro se basis.  Nevertheless, some of the relief sought by him appears to fall within the category of relief available to those plaintiffs who can establish that the discriminatory criterion prohibited by Title VII was a *motivating* (though not a *determinative*) factor in the challenged employment decision.  Therefore, the Court must keep the "motivating factor" standard in mind while evaluating the evidence in this case.  *Mock v. University of Pittsburgh at Johnstown*, 2007 WL 2253602, at *19, 2007 U.S. LEXIS 56741, at *63-64 (W.D.Pa. August 3, 2007).

[18]The Court acknowledges that Rouse appears to challenge more than simply II-VI's decision to discharge him.  Amended Complaint, ¶ 78.  Nevertheless, the Court has already determined that any claims based on conduct occurring before October 2, 2003, must be dismissed.  *Rouse v. II-VI Incorporated*, 2007 WL 1007925, at *8, 2007 U.S. Dist. LEXIS 23679, at *23 (W.D.Pa. March 30, 2007).  The only conduct alleged to have occurred after that date concerned Rouse's discharge, which he alleges to have been precipitated by a conspiracy against him.  Amended Complaint, ¶¶ 55-62.

[19]It is firmly established that state courts have concurrent jurisdiction to entertain actions brought under Title VII.  *Raygor v. Regents of the University of Minnesota*, 534 U.S. 533, 554, n. 15 (2002)(Stevens, J., dissenting); *Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820, 821-826 (1990); *Lassiter v. LabCorp Occupational Testing Services, Inc.*, 337 F.Supp.2d 746, 751 (M.D.N.C. 2004); *Hirschbiel v. Johnson*, 118 F.Supp.2d 903, 904-905 (N.D.Ind. 2000).  A similar rule applies to ADEA claims.  29 U.S.C. § 626(c)("Any person aggrieved may bring a civil action in *any court of competent jurisdiction* for such legal or equitable relief as will effectuate the purposes of this Act . . .")(emphasis added).  The Court of Common Pleas had the legal competence to entertain Rouse's Title VII and ADEA claims.  *Bailey v. Storlazzi*, 729 A.2d 1206, 1209, n. 3 (Pa.Super.Ct. 1999)(recognizing that Pennsylvania courts enjoy concurrent jurisdiction over Title VII claims).  Rouse's fifth amended complaint was filed in the Court of Common Pleas on January 19, 2006.  Def. Exh. CC.  The EEOC issued Rouse a right to sue letter on January 31, 2006.  Def. Exh. HH.  The Defendants filed their preliminary objections to the fifth amended complaint on February 6, 2006.  Def. Exh. DD.  It is unclear whether Rouse, after receiving his right to sue letter, would have been able to amend his complaint a sixth time in order to add his Title VII and ADEA claims.  There is some authority supporting the idea that he would have been obliged to do so if at all possible, and that his failure to do so should result in such claims being barred by the doctrine of res judicata.  *Heyliger v. State*

623(a). It is to that inquiry that the Court now turns.

The Defendants contend that Rouse cannot establish a prima facie case under Title VII or the ADEA. Brief in Support of Motion for Summary Judgment, p. 12. They base their argument on Rouse's inability to establish that he was treated differently from other, similarly situated individuals who did not share his protected traits. Rouse responds by asserting that this inquiry, which centers on the fourth element of his prima facie case, is flexible enough to encompass his situation. Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 19. The Court acknowledges that the critical question is whether Rouse was discharged under circumstances which would give rise to an inference of unlawful discrimination, not whether he was replaced by a younger, white individual. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)("Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case."); *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353 (3d Cir. 1999)("Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class–which in the present context is presumably true of all but the most misogynistic employers–and does not establish that the employer did not fire the plaintiff on the basis of her protected status."); *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491, n. 4 (M.D.Pa. 2005)("We recognize that there may be some circumstances wherein a plaintiff can demonstrate an inference of discrimination even if he is replaced by an insignificantly younger individual."). Nevertheless, Rouse must still identify circumstances surrounding his discharge which could permit a reasonable jury to infer that he was terminated because of his race, or because of his age.

It is undisputed that Rouse is a black male, and that he was born on October 6, 1960.

---

*University and Community College System of Tennessee*, 126 F.3d 849, 851-856 (6th Cir. 1997). In any event, however, claim preclusion is an affirmative defense. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 293 (2005)(noting that res judicata is listed in Federal Rule of Civil Procedure 8(c) as an affirmative defense). The Defendants do not raise the issue of res judicata with respect to Rouse's claims under Title VII and the ADEA. Therefore, the Court will address these claims on the merits. The Court expresses no opinion as to whether such claims would be precluded under the doctrine of res judicata, in accordance with § 1738, if the Defendants had raised the issue.

Rouse Deposition, p. 4.  At the time of his discharge, Rouse was 43 years old.  The decision to terminate him was made by Glick.  On August 27, 2007, Glick testified that he was 42 years old. Glick Deposition, p. 58.  Thus, Rouse is only a year or two older than Glick.  That fact alone, of course, is not dispositive.  "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group."  *Castaneda v. Partida*, 430 U.S. 482, 499 (1977). Nonetheless, it cannot be doubted that Glick's age is *relevant* to the overall inquiry as to whether Rouse's discharge occurred under circumstances permitting an inference of age discrimination. *Pivirotto*, 191 F.3d at 354 ("The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence.").

Rouse contends that, after his discharge, some of his duties were given to a younger employee named Kevin Debiase ("Debiase").  Brief in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, p. 24.  Glick testified that Debiase was an engineer rather than a scientist.  Glick Deposition, p. 30.  It is not clear, based on the present state of the record, whether Rouse and Debiase were similarly situated.  Rouse also appears to rely on the hiring of an "older" engineer in 2001, who had been given similar duties to that of Rouse, as evidence of age discrimination.  Amended Complaint, ¶ 39.  In his deposition, Rouse identified that engineer as Roger Hemmer ("Hemmer").  Rouse Deposition, p. 26.  It is not clear to the Court how Rouse figures that the *hiring* of Hemmer bolsters his ADEA claims.  Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 24.  As an initial matter, the ADEA does not prohibit discrimination which favors the old and disfavors the young. *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 594-600 (2004).  Rouse testified that Hemmer was older than he was.  Rouse Deposition, p. 26.  Even if II-VI hired Hemmer in 2001 with the specific intention of having him replace Rouse in 2004, there could be no ADEA violation (even if it is assumed that age was the determinative factor in the decision).  Hemmer is apparently no longer employed by II-VI.  If Rouse is attempting to use Hemmer's *departure* as a basis for establishing that II-VI was trying to get rid of "older" employees, his argument is also unavailing.  Szeles testified that Hemmer voluntarily terminated his employment relationship

27

with II-VI, and there appears to be no evidence to the contrary.  Szeles Deposition, p. 9.  Under these circumstances, the Court has serious doubts as to whether Rouse can establish a prima facie case of age discrimination.  An inference of age discrimination cannot be drawn solely because a person over the age of 40 has been terminated.  Nevertheless, for the purpose of this case, the Court will assume *arguendo* that Debiase's alleged assumption of Rouse's duties is sufficient to permit Rouse's ADEA claims to satisfy the prima facie inquiry.[20]  The Court will assume the same with respect to race discrimination under Title VII, since Rouse testified that Szeles had repeatedly singled him out for unwarranted criticisms.[21]  Rouse Deposition, pp. 28-33.  Szeles, of course, recommended that Rouse be terminated.  Szeles Deposition, p. 7.

Even if it is assumed that Rouse can satisfy the prima facie hurdle, the record does not contain evidence casting doubt on the reasons provided by II-VI for discharging him.  At the outset, it is worth reiterating the burden placed upon II-VI at this stage, which was described by the Supreme Court in *Burdine*:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  The defendant need not persuade the court that it was actually motivated by the proffered reasons.  See [*Board of Trustees of Keene State College v.*] *Sweeney*, [439 U.S. 24,] 25 (1978).  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.  The explanation provided must be legally sufficient to justify a judgment for the defendant.  If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.  Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.  The sufficiency of the defendant's evidence

---

[20]The Court notes that the Defendants place little emphasis on their argument concerning the prima facie inquiry in this case.  Brief in Support of Motion for Summary Judgment, p. 12.

[21]The Court's analysis proceeds in this manner primarily to facilitate a more thorough discussion of the evidence.  *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008)("Lastly, it is important to remember that the *prima facie* case and pretext inquiries often overlap.  As our jurisprudence recognizes, evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.")(emphasis in original).

should be evaluated by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. at 254-256 (footnotes omitted). In evaluating II-VI's evidence for this purpose, the Court cannot engage in a "credibility assessment." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). In this context, II-VI bears a burden of *production* rather than a burden of *persuasion*. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

Based on the evidence of record, the Court has little trouble concluding that II-VI has satisfied its burden of production. Szeles testified that he had recommended that Rouse be terminated because of his poor performance. Szeles Deposition, p. 7. Glick, who made the ultimate decision to discharge Rouse, testified that his discussions with Rouse in May 2004 had convinced him that Rouse was not functioning at the level expected of scientists at II-VI. Glick Deposition, pp. 32-35. In her deposition, Courtney explained that her investigation on behalf of the Human Resources Department had revealed the documentation of an ongoing performance issue with respect to Rouse. Courtney Deposition, p. 6. The Court also notes that the record contains documentary evidence corroborating the testimony of Glick, Szeles and Courtney. Rouse's first two performance appraisals indicated that he had been performing as expected. Def. Exhs. L & M. Nevertheless, his third appraisal was not favorable. On June 27, 2003, Szeles reported that Rouse needed to show significant improvement. Def. Exh. N. This appraisal followed a detailed evaluation of Rouse's performance signed by Szeles on June 19, 2003. Def. Exh. O. The employee performance review data maintained by II-VI indicates that Rouse did not receive pay increases in 2003 and 2004 because of "performance issues." Def. Exh. A. He was apparently denied a pay increase on January 31, 2003, due to II-VI's "economic condition." *Id.* Nonetheless, a notation dated April 30, 2003, indicates that his pay was not increased because of his performance. *Id.* A similar notation was made on April 30, 2004. *Id.* Rouse was terminated a few weeks later.

Glick and Szeles recorded their recollections of their discussions with Rouse in May 2004. According to the documentary evidence, their concerns about Rouse centered on his alleged inability to recognize that some of his scientific conclusions had already been accepted by the scientific community at large, and that he had added nothing new to the scientific endeavors

of II-VI. Def. Exhs. S & T. They also noted that Rouse had been resistant to their criticisms, adhering to his view that his performance was acceptable. *Id.* This evidence is more than sufficient to satisfy the Defendants' burden of production under *Burdine*.

The burden now shifts to Rouse to point to *some evidence*, direct or circumstantial, from which a reasonable finder of fact could either (1) disbelieve II-VI's articulated reasons for discharging him; or (2) believe that an invidiously discriminatory reason was more likely than not a *motivating* or *determinative* factor in II-VI's decision. *Iadimarco v. Runyon*, 190 F.3d 151, 165-166 (3d Cir. 1999). In order to establish liability under Title VII or the ADEA, it is not sufficient for Rouse to convince a finder of fact that II-VI's proffered reasons for discharging him are false. Since the ultimate question is whether II-VI engaged in unlawful discrimination, Rouse must convince a finder of fact that II-VI's *real reason* for terminating him was a discriminatory animus. *Reeves*, 530 U.S. at 146-147. However, Rouse need not introduce "additional, independent evidence of discrimination." *Id.* at 149. It is assumed that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147; *Furnco Construction Corp.*, 438 U.S. at 577 ("Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.")(emphasis in original). Therefore, " a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

Rouse contends that he need not present evidence aside from his own testimony in order to defeat the motion of II-VI for summary judgment. Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 16. The Court acknowledges that "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990). A plaintiff's testimony, however, must do more than simply express the subjective conclusion that discrimination has occurred. In order to proceed to trial,

Rouse must *either* cast doubt on the proffered reasons of II-VI for terminating him *or* affirmatively demonstate that II-VI most likely acted on the basis of a discriminatory animus. *Iadimarco*, 190 F.3d at 165-166. The testimony of Rouse does neither.

Rouse testified that he had never heard Glick, Szeles, Courtney, Johnson, Acre or Kramer make derogatory comments about his race or age.[22] Rouse Deposition, pp. 33-38. He indicated that his only basis for believing that his race or age was a factor in the decision to discharge him was his belief that the critical evaluation of his performance was unjustified. *Id.* Rouse testified as follows:

> Q.   Do you have any information or evidence to lead you to believe why Casaba Szeles would discriminate against you because you are black?
>
> A.   Well, discrimination philosophically I believe is based on ignorance basically; so, again, I don't know–and is something that is personal, so I have no idea what's in his head at this point or what causes him at this point or anyone else to be discriminatory or prejudiced against someone else.
>
> Q.   Am I correct in saying that you feel he discriminated against you because you were black and because he's white?
>
> A.   Again, I have no idea what's in his head or what causes anyone to be prejudiced for that matter.
>
> Q.   Have you seen him do anything, whether it related to you or not, that leads you to believe that he has any dislike toward black people?
>
> A.   I'm sorry. I missed the question.

---

[22]Roughly one month after the Defendants' filed their motion for summary judgment, Rouse submitted an affidavit. In the affidavit, he claimed that, at a May 14, 2004, meeting to discuss his performance, Glick had "gestured in an ape-like fashion" while reading portions of Rouse's rebuttal to Szeles' 2002/2003 performance appraisal. Rouse Affidavit, ¶ 80. Rouse presumably views this as evidence supporting his assertion that Glick was motivated by a racial animus. Nevertheless, this affidavit contradicts Rouse's prior deposition testimony, which indicates that none of the individual defendants had ever made comments which led him to believe that they harbored an animus based on race or age. Rouse Deposition, pp. 33-38. A non-moving party cannot create a *genuine* issue of material fact by submitting an affidavit which contradicts his or her own prior deposition testimony. Thus, Rouse's affidavit is not sufficient to defeat the Defendants' motion for summary judgment in this case. *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007)("Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.").

Q.	Have you ever seen Mr. Szeles do anything or say anything, whether it was directed toward you or not, that led you to believe that he dislikes black people?

A.	No, I mean, besides what I've experienced and the things that he–the treatment that he gave to me, no. I mean, I don't live or hang around him, so I don't know what he does with other people. I really don't know.

Q.	And I would ask you the same question relative to age, have you ever seen him do anything or say anything, whether it involved you or not, that led you to believe that he had a dislike for people over 40 years of age?

A.	No, for the exact same answer because I have no recollection beyond my experiences.

*Id.* at 48-49. Rouse appears to base his entire case on pure speculation about the motives behind his discharge. "Speculation is simply not evidence of discrimination." *Hicks v. Tech Industries*, 512 F.Supp.2d 338, 348 (W.D.Pa. 2007). Numerous courts have opined that a plaintiff's subjective perception of discrimination, standing alone, cannot defeat a defendant's motion for summary judgment. *Morris v. Yale University School of Medicine*, 477 F.Supp.2d 450, 461 (D.Conn. 2007); *Murphree v. Potter*, 226 F.Supp.2d 826, 838 (N.D.Miss. 2002); *Jordan v. AllGroup Wheaton*, 218 F.Supp.2d 643, 651 (D.N.J. 2002); *Mroczek v. Bethlehem Steel Corp.*, 126 F.Supp.2d 379, 384 (E.D.Pa. 2001); *Kennedy v. Kelly Temporary Services*, 95 F.Supp.2d 1288, 1294 (M.D.Ala. 2000); *Hartman v. Pena*, 914 F.Supp. 225, 231 (N.D.Ill. 1995); *Rabinovitz v. Pena*, 905 F.Supp. 522, 532 (N.D.Ill. 1995); *Mallon v. Prudential Property & Casualty Insurance Co.*, 688 F.Supp. 997, 1006 (D.N.J. 1988); *Mackey v. Whitehall Laboratories*, 681 F.Supp. 591, 594 (N.D.Ind. 1987).

Glick testified that he had made the decision to terminate Rouse in May 2004, after participating in conversations with Rouse and Szeles that, in his view, demonstrated Rouse's lack of competence to function as a scientist at II-VI. Glick Deposition, pp. 32-33. Significantly, Rouse points to no evidence which directly contradicts Glick's testimony concerning these conversations. Indeed, Rouse appears to overlook such conversations by arguing that the failure by II-VI to discharge him *sooner* somehow casts doubt on the idea that his performance had been poor for several months. Brief in Support of Plaintiff's Opposition to Defendants' Motion for

Summary Judgment, p. 22.  Absent some evidence that Rouse did not demonstrate a lack of competence in his discussions with Szeles and Glick in May 2004, no reasonable jury could discount the proffered reasons of II-VI for terminating his employment.

Rouse did testify that, according to Szeles, Acre had warned Glick in 2003 that any move to discharge Rouse could cause problems because of his membership in two statutorily protected classes.  Rouse Deposition, p. 52.  Szeles testified that he had no recollection of this conversation.  Szeles Deposition, pp. 5-6.  Acre emphatically denied that she had issued such a warning.  Acre Deposition, pp. 6-7.  Indeed, she indicated that she had not had any discussions with II-VI personnel in 2003 concerning Rouse's potential termination.  *Id.*, p. 6.  Glick likewise denied that Acre had warned him about the legal consequences of discharging Rouse.  Glick Deposition, pp. 6-7.  Nevertheless, even if Rouse's testimony about the warning is believed, it would not discount II-VI's reasons for terminating him.  A conscious awareness of one's membership in a protected class cannot be equated with an animus against members of that class.  If it were otherwise, employers would be unable to prevail at the summary judgment stage precisely *because* they have demonstrated an awareness of their obligations under the law.  Even when viewed in the light most favorable to Rouse, the alleged warning issued by Acre to Glick in 2003 does not suffice to discount Glick's reasons for discharging Rouse in 2004.

In the employment discrimination context, the Supreme Court has noted that a court faced with a motion for a judgment as a matter of law must consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  *Reeves*, 530 U.S. at 148-149.  In this case, such factors clearly weigh in favor of summary judgment.  Rouse's prima facie case is relatively weak.  His discharge did not occur under circumstances giving rise to an inference of discrimination.  Indeed, the Court has merely assumed *arguendo* that he can satisfy the prima facie hurdle.  The explanation provided by II-VI for the termination of Rouse is well supported by both testimonial and documentary evidence.  Rouse's own testimony, even if believed, does little to call the motives of II-VI into question.  Moreover, there is no unique, case-specific evidence which would permit a rational trier of fact to conclude that II-VI has engaged in unlawful discriminatory

practices.[23]

The Court acknowledges that Rouse vehemently disagrees with II-VI's evaluation of his performance as a scientist. Nevertheless, "[a]ny pretext determination is concerned with 'whether the employer honestly believes in the reasons it offers,' not whether it made a bad decision." *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994), quoting *Kralman v. Illinois Department of Veterans' Affairs*, 23 F.3d 150, 156-157 (7th Cir. 1994). Admittedly, "there is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Kralman*, 23 F.3d at 156. In any event, however, the evidence presented by Rouse clearly falls into the latter category.

Rouse's primary basis for believing that he was discharged because of his race or age is his inability to understand the reasons why Glick and Szeles were displeased with his job performance. Rouse Deposition, pp. 33-34. In *Bullock v. Children's Hospital of Philadelphia*, 71 F.Supp.2d 482 (E.D.Pa. 1999), the United States District Court for the Eastern District of Pennsylvania granted a defendant's motion for summary judgment under similar circumstances. Speaking about the prima facie inquiry, the District Court explained:

> Here, Bullock fails to present evidence that she was terminated under circumstances giving rise to an inference of discrimination. Bullock testified that she believed that Tietjen discriminated against her because of her race because she could not figure out any reason that he would have criticized her job performance. To make out a prima facie case of discrimination requires more than such speculation. Bullock's disagreement with Tietjen's assessment of her job performance is not sufficient to raise a presumption of discrimination.

*Bullock*, 71 F.Supp.2d at 490 (internal citation omitted). Even if it is assumed that Rouse can establish a prima facie case under Title VII or the ADEA, which is itself significantly questionable, it is clear that he cannot overcome the articulated reason of II-VI for his discharge merely by expressing disagreement with II-VI's assessment of his performance. Since no

---

[23]The Court does not view the "Separation Agreement and Release" as evidence sufficient to raise an inference of race or age discrimination. Having examined this document, the Court is convinced that it is a catch-all release listing various employment-related statutes. Def. Exh. JJ. The mere fact that it mentions Title VII, the ADEA and the PHRA would not enable a reasonable trier of fact to draw an inference of discrimination based on race or age.

reasonable jury could conclude that Rouse's race or age was a determinative factor in his termination, or that his race was a motivating factor in his termination, the Court must grant the Defendants' motion for summary judgment with respect to Rouse's discrimination claims under Title VII, the ADEA and the PHRA.[24]

## C. Retaliation

Rouse asserts retaliation claims under Title VII, the ADEA and the PHRA.[25]  Amended Complaint, ¶¶ 81-86, 94-99, 107-112.  Much of the conduct alleged to have been retaliatory occurred prior to October 3, 2003.  *Id.*, ¶ 67.  Claims for conduct occurring prior to that date have already been dismissed as untimely.  *Rouse*, 2007 WL 10007925, at *8,  2007 U.S. Dist. LEXIS 23679, at *23.  Consequently, the Court's consideration of Rouse's retaliation claims is limited to conduct alleged to have occurred no earlier than the end of 2003.  The Court acknowledges, however, that *evidence* of prior conduct can be considered for the purpose of establishing the existence of a retaliatory animus with respect to timely filed claims.  *National Railroad*

---

[24]Although most of Rouse's claims which allege conduct prior to October 3, 2003, have been previously dismissed, such conduct could be considered if it had been part of a "hostile work environment" claim.  *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)("As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has 'occurred,' even if it is still occurring.  Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.").  In addition to his discriminatory discharge claims, Rouse appears to allege that he was subjected to a "hostile work environment."  Amended Complaint, ¶ 78.  Nevertheless, the evidence does not support a determination that his work environment was hostile.  In a 2003 rebuttal to his performance appraisal, Rouse stated: "Csaba and I do discuss and argue about science and interpretations of it yet, I deep inside believe, and have always interpreted it, as a sign of the intense passion we both have for what we do."  Def. Exh. P.  An employee is not subject to a "hostile work environment" merely because he is unjustly criticized.  In order to establish the existence of a "hostile work environment," Rouse must establish that he endured harassing behavior sufficiently severe to alter the terms, conditions or privileges of his employment.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  An isolated incident amounts to a change in the terms, conditions or privileges of one's employment only if it can be fairly characterized as "extremely serious."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Title VII and the ADEA prohibit only those forms of harassment that are severe or pervasive enough to create a hostile or abusive work environment.  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147 (2004).  The standard is objective, making the subjective sensitivities of a particular plaintiff irrelevant.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview.").  The evidence of record could not sustain a finding that Rouse's work environment at II-VI was sufficiently hostile to satisfy this standard.  Consequently, Rouse cannot defeat the Defendants' motion for summary judgment by relying on a theory distinct from his discriminatory discharge theory.

[25]The retaliation claims of Rouse under § 1981 and § 1985(3) need not be addressed on the merits, since they are barred by the doctrine of res judicata.  Amended Complaint, ¶¶ 120-125, 133-137.

*Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely filed claim.").

The anti-retaliation provision of Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII's substantive provisions] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e-3(a). The ADEA contains an anti-retaliation provision that is not materially different from that contained in Title VII, thereby providing protection for those employees who oppose proscribed age discrimination practices. 29 U.S.C. § 623(d). In addition, the PHRA has an anti-retaliation provision prohibiting employers from retaliating against employees who oppose discrimination based on the criteria enumerated therein, including discrimination based on race and age. 43 P.S. § 955(d). Rouse asserts retaliation claims under all three of these provisions, which are generally construed in the same manner. *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 710 (W.D.Pa. 2006)(treating the anti-retaliation provisions contained in Title VII, the ADEA, the PHRA and the Americans with Disabilities Act as coextensive). To establish a prima facie case of retaliation under the applicable statutory provisions, Rouse must demonstrate: (1) that he engaged in conduct protected under the relevant provision; (2) that II-VI took a materially adverse[26] action against him; and (3) that there was a causal relationship between his protected conduct and II-VI's materially adverse action. *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

With respect to the first element, which centers on the issue of protected conduct, the Court makes two important observations. First of all, the category of conduct protected under Title VII, the ADEA and the PHRA is not limited to the filing of formal complaints or the initiation of administrative exhaustion. Informal complaints constitute "protected activity" under these statutes. *Lin v. Rohm & Haas Co.*, 293 F.Supp.2d 505, 512, n. 2 (E.D.Pa. 2003).

---

[26]The Court of Appeals for the Third Circuit did not specifically refer to a "materially adverse" action in *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). In this case, the Court has added that term in order to incorporate the standard adopted by the Supreme Court in *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405, 2415 (2006).

"'Protected activity' includes informal protests of discrimination such as complaints to management." *Bailey v. Storlazzi*, 729 A.2d 1206, 1214, n. 9 (Pa.Super.Ct. 1999). Second, the conduct complained of need not be independently actionable under the applicable substantive provision. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). In other words, it is enough for a plaintiff to demonstrate that he or she acted under a reasonable belief that the conduct of which he or she complained constituted a violation of the relevant statute. *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 187-188 (2005)(Thomas, J., dissenting); *Crumpacker v. Kansas Department of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003); *Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838, 845, n. 1 (9th Cir. 2002); *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001); *Johnson v. University of Cincinnati*, 215 F.3d 561, 579-580 (6th Cir. 2000); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Griffiths v. Cigna Corp.*, 988 F.2d 457, 468 (3d Cir. 1993). A plaintiff cannot establish that he or she engaged in protected conduct merely by showing that he or she made generalized complaints about unfair treatment that did not, in some way, involve allegations of prohibited discrimination. *Barber v. CXS Distribution Services*, 68 F.3d 694, 702 (3d Cir. 1995)("A general complaint of unfair treatment does not translate into a charge of illegal age discrimination."). Moreover, complaints about trivial conduct (i.e., conduct that no reasonable person would view as being violative of an anti-discrimination statute) do not constitute "protected activity." *Clark County School District v. Breeden*, 532 U.S. 268, 271-272 (2001)(explaining why an employee who had complained about co-workers' trivial, sexually-oriented jokes had not engaged in "protected conduct" under Title VII); *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)(explaining that Title VII's substantive provisions do not establish a "general civility code" for the workplace).

Rouse satisfies the first element of his retaliation cause of action with respect to race discrimination, but not with respect to age discrimination. At his deposition, Rouse testified that, prior to being informed of his discharge on May 19, 2004, he had never complained in writing about discrimination. Rouse Deposition, pp. 72-73. He further testified that he had orally

complained to Glick in May 2004 about being the victim of race discrimination. *Id.*, pp. 73-75.

Nevertheless, he acknowledged that he could not recall having made similar complaints about

being the victim of age discrimination. *Id.*, p. 75. Rouse's admission that he had never

complained about potential violations of the ADEA is fatal to his retaliation claims thereunder.

Thus, the Defendants are clearly entitled to summary judgment as to Count 6 of the amended

complaint, which asserts ADEA-based retaliation claims. Amended Complaint, ¶¶ 107-112.

The Defendants are likewise entitled to summary judgment as to Count 4, which asserts PHRA-

based retaliation claims, to the extent that such claims are based on age discrimination. *Id.*, ¶¶

94-99. Rouse's testimony is sufficient to establish, for the purpose of summary judgment, that he

engaged in "protected activity" under Title VII. Consequently, his retaliation claims under Title

VII, as well as his race-based retaliation claims under the PHRA, must be evaluated further.

With respect to the second element of Rouse's retaliation claims, the applicable standard

was enunciated two years ago by the Supreme Court in *Burlington Northern & Sante Fe Railway*

*Co. v. White*, 126 S.Ct. 2405 (2006). In *Burlington Northern*, the Supreme Court explained that

the anti-retaliation provision of Title VII "does not confine the actions and harms it forbids to

those that are related to employment or occur at the workplace." *Burlington Northern*, 126 S.Ct.

at 2409. In order to advance his retaliation claims, Rouse must show that the alleged retaliatory

actions taken against him would have been *materially* adverse to a reasonable employee. This

standard of material adversity is designed to "screen out trivial conduct while effectively

capturing those acts that are likely to dissuade employees from complaining or assisting in

complaints about discrimination." *Id.* at 2416. Rouse easily surmounts this hurdle, since it is

undisputed that he was discharged. Hence, the Court must consider whether a reasonable jury

could conclude that there was a causal relationship between his protected activity (i.e., his

complaints to Glick about race discrimination) and the decision of II-VI to terminate his

employment.

Assuming Rouse's testimony to be true, the Court notes that Rouse complained to Glick

about race discrimination shortly before his termination. Temporal proximity between protected

activity and an alleged retaliatory action can satisfy the element of causation where the timing of

the action is "unusually suggestive" of a retaliatory motive. *Shaner v. Synthes (USA)*, 204 F.3d

494, 505 (3d Cir. 2000). Nevertheless, like claims of discrimination, retaliation claims are analyzed in accordance with the *McDonnell Douglas-Burdine* framework. *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 300 (3d Cir. 2007). The Court has already determined, within the context of Rouse's claims of discrimination, that the record does not contain evidence which sufficiently casts doubt on II-VI's reason for discharging Rouse to enable a reasonable jury to conclude that he was the victim of unlawful discrimination. This reasoning applies with equal force to his retaliation claims.

The Court of Appeals for the Third Circuit recently addressed the issue of causation under Title VII in *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358 (3d Cir. 2008). The facts in *Doe* are relatively straightforward. An employer discharged a female employee five days after she had undergone a surgical abortion. *Doe*, 527 F.3d at 362-363. The employee's supervisor contended that he had discharged the female because she had failed to inform him that she would not be coming to work. *Id.* at 370. Nevertheless, the employee's husband testified that he had spoken with the supervisor six days earlier, informing him that the female would not be able to report for work during the following week. *Id.* at 370-371. The husband's testimony was corroborated by the testimony of another witness. *Id.* at 371. Because the rationale posited by the employer for the employee's discharge (i.e., her failure to inform her supervisor that she would not be available to work) was called into doubt by the testimony of two witnesses, the Court of Appeals reasoned that a rational jury could conclude that the employer had retaliated against her for choosing to undergo an abortion, thereby violating Title VII's prohibition of discrimination based on sex.[27] *Id.* The employer's articulated reason for the employee's discharge was further discredited by evidence that her supervisor had made comments which could have been construed as an indication that he did not approve of her decision to have an abortion. *Id.* at 368-369. Under such circumstances, summary judgment could not be granted.

The instant case differs meaningfully from *Doe*. As noted earlier, the record contains a

_____

[27]Title VII provides that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or *related medical conditions*[,]" and that "women affected by pregnancy, childbirth, or *related medical conditions* shall be treated the same for all employment-related purposes . . ." 42 U.S.C. § 2000e(k)(emphasis added). The Court of Appeals construed the words "related medical conditions" to mean that discrimination against a woman who opts to undergo an abortion constitutes sex discrimination under Title VII. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008).

significant quantity of evidence which supports the articulated reason of II-VI for discharging Rouse. Both the testimonial and documentary evidence indicates that, at least from the perspective of II-VI, Rouse had not been performing as expected for a period of at least one year prior to his discharge. Szeles Deposition, p. 7; Glick Deposition, pp. 32-35; Courtney Deposition, p. 6; Def. Exhs. A, N & O. There is nothing in the record which sufficiently casts doubt on this proffered reason for Rouse's termination to enable a reasonable jury to conclude that Rouse was discharged in retaliation for his complaints about race discrimination. *Reeves*, 530 U.S. at 147 (explaining that a factfinder, in order to find a statutory violation, must not only *disbelieve* the employer's proffered explanation for an adverse action, but must also *believe* the employee's explanation of discriminatory or retaliatory animus). Moreover, unlike the situation in *Doe*, there is no evidence that the decisionmakers were motivated by a retaliatory animus.[28] Indeed, Rouse affirmatively testified that he had never heard Glick, Szeles, Courtney, Johnson, Acre or Kramer utter comments evincing a dislike for blacks or older workers. Rouse Deposition, pp. 33-38. Glick's written summaries of his meetings with Rouse in May 2004 contain no references to complaints about race discrimination. Def. Exh. T. Like his discrimination claims, Rouse's retaliation claims appear to be based purely on his own speculation.

Rouse argues that the explanation of II-VI for his discharge is undermined by two particular facts. First, he contends that Glick failed to honor his request that he be given a chance to meet with higher II-VI officials. Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 27. Second, he argues that II-VI personnel were informed that they were not permitted to provide references for him.[29] Amended Complaint, ¶ 68. Neither of these arguments warrant the denial of summary judgment. In his deposition, Glick

---

[28]The Court acknowledges that *Doe* involved a sex discrimination claim rather than a retaliation claim. Nevertheless, because of the precise nature of the form of discrimination at issue (i.e., discharge allegedly occurring in response to a female employee's decision to have an abortion), the facts in *Doe* were more analogous to those often encountered in retaliation cases than they were to those typically present in discrimination cases.

[29]The Court of Appeals for the Third Circuit has recognized that a retaliation claim may be cognizable where an employer which regularly provides references for its former employees inexplicably fails or refuses to do so for an employee who has filed a charge of discrimination with the EEOC. *Equal Employment Opportunity Commission v. L.B. Foster Co.*, 123 F.3d 746, 753-755 (3d Cir. 1997).

acknowledged that Rouse had requested a meeting with higher II-VI officials. Glick Deposition, pp. 30-31. Nevertheless, he explained that Rouse's request had not been honored because *he* had been responsible for determining whether Rouse should be retained, and that *he* had already obtained sufficient information to make that decision. *Id.* Furthermore, both Glick and Acre testified that II-VI had a uniform policy of not providing references for former employees. Glick Deposition, pp. 38-39; Acre Deposition, pp. 25-26. Although the policy was not reduced to writing, Rouse has produced no evidence to rebut the testimony of Glick and Acre concerning the existence of such a policy.[30]

Since Rouse can neither discount the articulated reasons of II-VI for discharging him nor provide affirmative evidence that II-VI was motivated by a retaliatory animus, no reasonable jury could conclude that he was discharged (or otherwise victimized) in retaliation for complaining about race discrimination. As noted earlier, Rouse cannot establish that he engaged in conduct protected under the ADEA. Accordingly, the Court must grant the Defendants' motion for summary judgment with respect to Counts 2, 4 and 6, which assert claims for retaliation under Title VII, the PHRA and the ADEA.

## D. The Application of the ERISA

In Count 17 of the amended complaint, Rouse alleges that II-VI violated § 510 of the ERISA, which is codified at 29 U.S.C. § 1140. Amended Complaint, ¶¶ 160-166. That statutory provision makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . ." 29 U.S.C. § 1140. Rouse alleges that II-VI terminated him 17 months prior to the full vesting of his pension retirement benefit plan and 8 months prior to the vesting of his contractually promised stocks. Amended Complaint, ¶¶ 162-163. He also alleges that his discharge occurred in retaliation for complaints that he had voiced about his compensation and fringe benefits. *Id.*, ¶¶

---

[30]Rouse also appears to argue that he was not adequately warned that he needed to improve his performance. This argument has no merit. The record contains considerable evidence to support II-VI's assertion that Rouse had been warned that he was not performing as expected. Glick Deposition, pp. 20-21; Def. Exhs. A, N & O.

161.

In order to prevail under the ERISA, Rouse must establish that: (1) II-VI engaged in conduct prohibited under the ERISA (i.e., II-VI discharged Rouse); and (2) II-VI's action was taken for the *purpose* of interfering with Rouse's attainment of any protected right or benefit to which he would have become entitled had he not been discharged. *Romero v. Smithkline Beecham*, 309 F.3d 113, 119 (3d Cir. 2002). While it is not necessary for Rouse to establish that the sole purpose of II-VI for discharging him was to prevent his attainment of benefits, he must demonstrate that II-VI acted with the "specific intent" to interfere with his attainment of such benefits. *DeWitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 522 (3d Cir. 1997). Rouse devotes very little attention to his ERISA claims.[31] Nonetheless, he contends that he was terminated just 20 hours before another 20% of his pension retirement benefits would have vested (which would have put him at an 80% vesting rate). Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 26. Be that as it may, it is not sufficient for Rouse to show that he lost benefits as an incidental result of his termination. *DeWitt*, 106 F.3d at 522-523. Claims under the ERISA, like claims of discriminatory discharge under Title VII or the ADEA, are evaluated in accordance with the *McDonnell Douglas-Burdine* framework. *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 923, n. 17 (3d Cir. 1990). The Court has already determined, in both the discrimination context and the retaliation context, that Rouse has not produced sufficient evidence to discount II-VI's articulated reason for terminating him. This reasoning

_____

[31]Because Rouse has not thoroughly developed his ERISA claims, it is not even clear whether they are cognizable in this context. In Count 17, he seeks "equitable damages." Amended Complaint, ¶ 166. Because his ERISA claims center on II-VI's alleged interference with his attainment of benefits, rather than on II-VI's alleged failure to pay benefits already owed, it appears that *Eichorn v. AT&T Corp.*, 484 F.3d 644 (3d Cir. 2007), would limit Rouse to the equitable remedies available under 29 U.S.C. § 1132(a)(3). In *Eichorn*, the Court of Appeals for the Third Circuit adopted a narrow construction of 29 U.S.C. § 1132(a)(1)(B), which permits a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" *Eichorn*, 484 F.3d at 654 (holding that a § 1140 claim for interference with benefits is not enforceable under § 1132(a)(1)(B)). Without the benefit of briefing on this issue, the Court will not resolve the question of whether Rouse's ERISA claims are precluded by *Eichorn*. Nevertheless, the Court observes that his claims would appear to be outside of the scope of § 1132(a)(1)(B), thereby requiring him to proceed under § 1132(a)(3), which provides only for equitable relief. It is clear that a plaintiff seeking relief under § 1132(a)(3) must tie his or her request to "a form of relief typically available in equity." *Id.* at 655. The Court expresses no opinion as to whether Rouse's claims can satisfy this standard. Resolution of that question is unnecessary, since Rouse cannot establish a violation of the ERISA in any event.

applies with equal force to Rouse's ERISA claims. Moreover, he has no affirmative evidence which indicates that II-VI discharged him in order to interfere with his attainment of statutorily protected benefits. Instead, he bases his ERISA claims solely on his own allegations. At the summary judgment stage, however, such "vague allegations of malicious termination, unsupported by any facts, are insufficient." *Romero*, 309 F.3d at 119. Thus, the Defendants are also entitled to summary judgment with respect to Count 17 of the amended complaint.

## Conclusion

The majority of Rouse's claims are barred by the doctrine of res judicata, which is incorporated by § 1738. The Superior Court's inability to address such claims on the merits was due solely to Rouse's failure to file a brief. A litigant cannot escape the preclusive effect of a decision rendered by a state tribunal merely by *filing*, but not *pursuing*, an appeal. The Defendants are entitled to summary judgment with respect to the remaining claims on the grounds that no reasonable factfinder could conclude, on the basis of the evidence contained in the record, that Rouse was discharged because of his race, because of his age, because of his impending attainment of retirement benefits, or in retaliation for opposing unlawful forms of discrimination. Accordingly, the Court must grant the motion for summary judgment (*Document No. 57*) filed by the Defendants. An appropriate order follows.


McVerry, J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMBROSIO ROUSE, PH.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **2:06-cv-566** |
| | ) | |
| **II-VI INCORPORATED, BRUCE** | ) | |
| **GLICK, individually, CSABA SZELES,** | ) | |
| **individually, KERRY COURTNEY,** | ) | |
| **individually, CARL JOHNSON,** | ) | |
| **individually, MARLENE ACRE,** | ) | |
| **individually, FRANCIS KRAMER,** | ) | |
| **individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER OF COURT

AND NOW, this 24th day of July, 2008, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the Defendants' Motion for Summary Judgment (*Document No. 57*) is **GRANTED IN ITS ENTIRETY**.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc:     Ambrosio Rouse, Ph.D.
        2770 St. Andrews Square
        Apt #2117
        Allison Park, PA 15101

        Samuel J. Pasquarelli, Esquire
        Email: sjp@sgkpc.com
        Beverly A. Block, Esquire
        Email: bab@sgkpc.com